[No. C067130. Third Dist. Oct. 24, 2012.]

ALBERT GARLAND, Plaintiff and Appellant, v.
CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD,
Defendant and Respondent.

## Counsel

Law Office of J. Scott Smith and J. Scott Smith for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Assistant Attorney General, Robert Byrne and Cecilia L. Dennis, Deputy Attorneys General, for Defendant and Respondent.

## Opinion

**BUTZ, J.**—This appeal concerns the scope of the government's jurisdiction under the federal Clean Water Act (the Act; 33 U.S.C. § 1251 et seq.) to regulate water pollutants. Enacted in 1972, the Act prohibits any person from discharging a pollutant into "navigable waters"—i.e., into "the waters of the United States"—from a "point source" (a discrete conveyance of pollutants) without a permit. (See 33 U.S.C. §§ 1251 et seq., 1311(a), 1342(a), 1362(7), (12), (14).)[1]

In *Rapanos v. United States* (2006) 547 U.S. 715 [165 L.Ed.2d 159, 126 S.Ct. 2208] (*Rapanos*), its most recent decision on the subject, the United States Supreme Court offered three distinct views concerning the Act's jurisdictional scope afforded by the phrase, "the waters of the United States" (§ 1362(7)). As we shall explain, we need not wade into these roiling waters to resolve the matter before us. This is because while the administrative civil liability (ACL) order at issue here is challenged on these jurisdictional

---

[1] Undesignated statutory references are to the Act as set forth in title 33 United States Code.

grounds, that order is authorized even under the *Rapanos* view that most narrowly reads the Act's jurisdiction. Consequently, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Albert Garland appeals from a judgment denying a petition for writ of administrative mandate (Code Civ. Proc., § 1094.5) brought by him (and his company, Tehama Market Associates, LLC—collectively, Garland).

Garland challenges a $250,000 ACL order issued against him in 2007 by the Central Valley Regional Water Quality Control Board (the Board) for permit violations of the Act in February 2004. The violations encompassed a conservatively estimated 641,000 gallons of sediment-laden storm water flowing off the north and east sides of a residential subdivision construction site being developed by Garland.[2] This flow entered into adjacent ephemeral drainages encompassing swales, ditches, and culverts (and entered into some wetlands as well, not relevant here) that eventually connected to "waters of the United States"—the Feather River and the Thermalito Afterbay—during high rainfall events.

In October 2007, Garland petitioned for a writ of administrative mandate challenging the ACL order.

In 2009, the trial court, in ruling on that petition, (1) rejected Garland's principal argument, concluding that the law and sufficient evidence supported the Board's finding that the ephemeral drainages were "waters of the United States" as tributaries of the Feather River and the Thermalito Afterbay and (2) rejected Garland's statute of limitations defense, but (3) remanded for further consideration of Garland's laches defense.

In 2010, the trial court, in ruling on a second petition for administrative mandate brought by Garland after the remand, upheld the Board's rejection of Garland's laches claim. Garland timely filed a notice of appeal from this 2010 judgment.[3]

---

[2] According to the Board, the $250,000 ACL order could have been based on as little as 25,000 gallons of polluted discharge. (Wat. Code, § 13385.)

[3] The Board is wrong in arguing that we have jurisdiction on appeal *only* to review the trial court's denial of Garland's laches claim. Garland could not have appealed the ruling on his first writ petition, as the trial court remanded the matter to the Board to further consider that laches claim. To avoid piecemeal appeals, an appeal—pursuant to the " 'one final judgment' " rule—" 'cannot be taken from a judgment that fails to *complete* the disposition of all causes of action between the parties . . . .' " (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 697 [107 Cal.Rptr.2d 149, 23 P.3d 43], italics added.)

## DISCUSSION

### I. The Issue

Garland contends the Board erroneously concluded that he violated the Act by discharging, without a proper permit, sediment-laden waters into ephemeral drainages adjacent to the construction site, based on the Board's incorrect finding that the drainages themselves were "waters of the United States."

Specifically, Garland argues that for a watercourse to constitute a "water[] of the United States," the watercourse either must be a "relatively permanent, standing or continuously flowing bod[y] of water" connected to an interstate navigable water (meeting the test of the four-justice plurality opinion of *Rapanos, supra*, 547 U.S. at pp. 739, 742 [165 L.Ed.2d at pp. 178, 180] (plur. opn. of Scalia, J., joined by Roberts, C. J., Thomas and Alito, JJ.)) or must have a " 'significant nexus' " to a navigable water (meeting the test of the result-only concurring opinion in *Rapanos* from Justice Kennedy (547 U.S. at p. 759 [165 L.Ed.2d at p. 190] (conc. opn. of Kennedy, J.)). There was no evidence before the Board to satisfy either one of these tests.

### II. Setting the Legal Stage for the Issue

■ The stated "objective" of the Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." (§ 1251(a).) To that end, the Act provides that "the discharge of any pollutant by any person shall be unlawful" (§ 1311(a)) without a proper permit (§ 1342(a)). The " 'discharge of a pollutant' " is defined broadly to include "any addition of any pollutant [including storm water sediment runoff] to navigable waters from any point source [(a discrete conveyance of pollutants)]." (§ 1362(12), (6) & (14); see *North Carolina Shellfish Growers Assn. v. Holly Ridge Associates* (E.D.N.C. 2003) 278 F.Supp.2d 654, 676–677.) And, as most relevant here, the Act defines " 'navigable waters' " as "the waters of the United States, including the territorial seas." (§ 1362(7).)

As a regulatory agency under the Act, the Army Corps of Engineers (hereafter, the Corps) has interpreted the statutory phrase "the waters of the United States" to cover all traditionally navigable waters, tributaries of those waters, and wetlands adjacent to those waters or those tributaries. (33 C.F.R. § 328.3(a)(1), (5), (7) (2012); *Rapanos, supra*, 547 U.S. at pp. 760–761 [165 L.Ed.2d at p. 191] (conc. opn. of Kennedy, J.); see *Rapanos*, at p. 792 [165 L.Ed.2d at p. 211] (dis. opn. of Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ.).)

The United States Supreme Court, in a trio of decisions dating from 1985, has itself tackled the interpretation of the statutory phrase, "the waters of the United States":

(1) In *United States v. Riverside Bayview Homes, Inc.* (1985) 474 U.S. 121 [88 L.Ed.2d 419, 106 S.Ct. 455] (*Riverside Bayview*), the Supreme Court upheld the Corps's interpretation of "the waters of the United States" as covering wetlands that "actually abut[] on" traditional navigable waterways. (*Id.* at p. 135 [88 L.Ed.2d at p. 431].)

(2) In *Solid Waste Agency of Northern Cook Cty. v. Army Corps Engineers* (2001) 531 U.S. 159 [148 L.Ed.2d 576, 121 S.Ct. 675] (*Solid Waste Agency v. Corps*), the Supreme Court concluded that " 'the waters of the United States' " did not extend to isolated, intrastate seasonal ponds used by migratory birds as habitat. (*Id.* at pp. 167, 171 [148 L.Ed.2d at pp. 584, 587] (maj. opn. of Rehnquist, C. J.).)

(3) And that brings us to *Rapanos, supra,* 547 U.S. 715 [165 L.Ed.2d 159] which, in three legally distinct and separate opinions, parted the "waters." The relevant question in *Rapanos* for our purposes was a question of law: Could wetlands, which lie near ephemeral ditches or manmade drains that eventually empty into traditional navigable waters, constitute " 'waters of the United States' " under the Act? (547 U.S. at p. 729 [165 L.Ed.2d at p. 172] (plur. opn.); see *id.* at p. 787 [165 L.Ed.2d at p. 208] (dis. opn. of Stevens, J.).)

The four-justice dissenting opinion of Justice Stevens in *Rapanos* answered this question, "Yes." This opinion upheld the Corps's regulatory interpretation of "the waters of the United States" specified above. (*Rapanos, supra,* 547 U.S. at pp. 787–788, 792 [165 L.Ed.2d at pp. 208–209, 211] (dis. opn. of Stevens, J.).) Relying on the Act's purpose and the Corps's ecological expertise, this dissenting opinion concluded that these wetlands reasonably could be considered adjacent to tributaries of traditionally navigable waters, and therefore constituted "waters of the United States." (*Ibid.* (dis. opn. of Stevens, J.).)

The four-justice plurality opinion of Justice Scalia in *Rapanos* answered this question, "No." Applying a dictionary definition of "waters" and expressing skepticism at federal appellate decisions that had interpreted "the waters of the United States" to include "ephemeral channels and drains as 'tributaries' " (citing as one example, among others, *Headwaters, Inc. v. Talent Irrigation Dist.* (9th Cir. 2001) 243 F.3d 526, 534 ["irrigation ditches and drains that intermittently connect to covered waters"]) (*Rapanos, supra,* 547 U.S. at p. 727 [165 L.Ed.2d at p. 170]), the four-justice plurality opinion concluded, for our purposes: "[T]he phrase 'the waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.' See Webster's [New

International Dictionary (2d ed. 1954)] [page] 2882. The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall. The Corps' expansive interpretation of . . . 'the waters of the United States' is thus not 'based on a permissible construction of the statute.' " (*Rapanos, supra*, 547 U.S. at pp. 739, 726–727 [165 L.Ed.2d at pp. 178, 170–171] (plur. opn.); see *id.* at pp. 732–733 [165 L.Ed.2d at pp. 173–174]] (plur. opn.).)

Finally, the third distinct opinion in *Rapanos*, the result-only concurring opinion of Justice Kennedy, answered this question, "Maybe." Noting *Solid Waste Agency v. Corps*'s observation that " '[i]t was the significant nexus between the wetlands and "navigable waters," ' . . . 'that informed our reading of the [Act] in *Riverside Bayview*,' " Justice Kennedy adopted this nexus standard as the guiding criterion in applying the statutory phrase "the waters of the United States" to wetlands and to tributaries. (*Rapanos, supra*, 547 U.S. at p. 767 [165 L.Ed.2d at p. 195] (conc. opn. of Kennedy, J.); see *Solid Waste Agency v. Corps, supra*, 531 U.S. at p. 167 [148 L.Ed.2d at p. 585].)

### III. Disposing of the Issue

As noted, Garland contends there was insufficient evidence that the ephemeral drainages here constituted "waters of the United States" under either Justice Scalia's plurality test in *Rapanos* (a relatively permanent body of water connected to traditional interstate navigable waters) or Justice Kennedy's concurrence test (significant nexus to navigable water), and therefore, there was no jurisdictional basis on which to impose the ACL order against him (including his company).

As we shall explain, we can sidestep this issue because the Board imposed the ACL order against Garland on an alternative basis (to whether the ephemeral drainages themselves constituted "waters of the United States"), and this alternative basis finds jurisdictional support even under the *Rapanos* opinion that most restrictively reads the Act's jurisdiction (i.e., the four-justice plurality opinion of Justice Scalia).

In issuing the ACL order against Garland, the Board indeed found that the ephemeral drainages—into which Garland discharged the construction site storm water runoff—were tributaries to downstream navigable waters, and therefore, these drainages themselves constituted "waters of the United States."

However, the Board also provided "[a]n alternative rationale" for issuing the ACL order against Garland. Said the Board, "An alternative rationale is

also available to demonstrate that a [pollutant] discharge [under the Act] occurred even if the pollutants [did] not directly enter waters of the United States. Were the receiving waters abutting the site [(i.e., the ephemeral drainages)] not waters of the United States . . . , a violation [of the Act could] still [have] occur[red] if the pollutants indirectly discharge[d] to waters of the United States [(citing in support the four-justice plurality opinion of Justice Scalia in *Rapanos*)].”

The Board's alternative rationale for issuing the ACL order against Garland is, pardon the expression, on solid ground. Whatever else may be said of the three legally distinct opinions in *Rapanos*, this much is clear: The four-justice plurality opinion of Justice Scalia took the narrowest view of the Act's jurisdiction (*Rapanos, supra*, 547 U.S. at pp. 746, 756 [165 L.Ed.2d at pp. 182, 188] (plur. opn. of Scalia, J.)); the four-justice dissenting opinion of Justice Stevens took the broadest (547 U.S. at pp. 808–809, 810, fn. 14 [165 L.Ed.2d at pp. 221, 223, fn. 14] (dis. opn. of Stevens, J.)); and the result-only concurring opinion of Justice Kennedy landed somewhere in between (547 U.S. 759 [165 L.Ed.2d 190] (conc. opn. of Kennedy, J.)). But that narrowest of jurisdictional views, the plurality opinion in *Rapanos*, explained the effect of its opinion on the Act's regulation of water pollutant discharge, an explanation directly relevant to the issue we face here. That explanation follows.

The *Rapanos* plurality first set the backdrop: “Respondents [(i.e., the parties in *Rapanos* that argued the Act applied)] and their *amici* urge that [the plurality's] restrictions on the scope of 'navigable waters'[, i.e., the plurality's narrow reading of 'the waters of the United States'] will frustrate enforcement against traditional water polluters under [sections] 1311 and 1342 [(the sections of the Act prohibiting the discharge of a pollutant into the waters of the U.S. from a point source without a permit—i.e., the sections at issue in the present opinion)]. . . . [R]espondents contend that water polluters will be able to evade the permitting requirement of [section] 1342(a) simply by discharging their pollutants into noncovered intermittent watercourses that lie upstream of covered waters.” (*Rapanos, supra*, 547 U.S. at pp. 742–743 [165 L.Ed.2d at p. 180] (plur. opn.).)

■ Then the plurality answered this contention: “That is not so. Though we do not decide this issue, there is no reason to suppose that our construction today significantly affects the enforcement of [section] 1342, inasmuch as lower courts applying [section] 1342 have not characterized intermittent channels as 'waters of the United States.' The Act does not forbid the 'addition of any pollutant *directly* to navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters.' § 1362(12)(A) (emphasis added); § 1311(a). Thus, from the time of the [Act's] enactment,

lower courts have held that the discharge into intermittent channels of any pollutant *that naturally washes downstream* likely violates [section] 1311(a) [(water pollutant discharge)], even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between. *United States* v. *Velsicol Chemical Corp.*, 438 F.Supp. 945, 946–947 (WD Tenn. 1976) (a municipal sewer system separated the 'point source' and covered navigable waters). See also *Sierra Club* v. *El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1137, 1141 ([10th Cir.] 2005) (2.5 miles of tunnel separated the 'point source' and 'navigable waters')." (*Rapanos, supra*, 547 U.S. at p. 743 [165 L.Ed.2d at p. 180] (plur. opn.).)

The *Rapanos* plurality then continued: "In fact, many courts have held that such upstream, intermittently flowing channels themselves constitute 'point sources' under the Act. The definition of 'point source' includes 'any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.' 33 U.S.C. § 1362(14). We have held that the Act 'makes plain that a point source need not be the original source of the pollutant; it need only convey the pollutant to "navigable waters." ' *South Fla. Water Management Dist.* v. *Miccosukee Tribe*, 541 U.S. 95, 105 [158 L.Ed.2d 264, 124 S.Ct. 1537] (2004). . . . Some courts have even adopted both the 'indirect discharge' rationale and the 'point source' rationale in the alternative, applied to the same facts. [Citation.] On either view, however, the lower courts have seen no need to classify the intervening conduits as 'waters of the United States.' [¶] . . . It does not appear, therefore, that the interpretation [the plurality] adopt[s] today significantly reduces the [pollutant discharge-permitting] scope of [section] 1342." (*Rapanos, supra*, 547 U.S. at pp. 743–745 [165 L.Ed.2d at pp. 180–181] (plur. opn.).)

The *Rapanos* plurality also addressed a further concern regarding its narrow interpretation of the Act's jurisdiction: "Respondents also urge that the narrower interpretation of 'waters' will impose a more difficult burden of proof in enforcement proceedings under [sections] 1311(a) and 1342(a) [(again, the sections at issue in the present opinion)], by requiring the [relevant administrative] agency to demonstrate the downstream flow of the pollutant along the intermittent channel to traditional 'waters.' . . . But, as noted above, the lower courts do not generally rely on characterization of intervening channels as 'waters of the United States' in applying [section] 1311 to the traditional pollutants subject to [section] 1342. Moreover, the proof of downstream flow of pollutants required under [section] 1342 [can be satisfied by the presence of] a hydrologic connection . . . . See [*U.S.* v. *Rapanos* (6th Cir. 2004)] 376 F.3d[ 629,] 639[ vacated and cause remanded *sub nom. Rapanos* v. *United States, supra*, 547 U.S. 715 [165 L.Ed.2d 159]]. [For example,] . . . testimony of hydrologic connections based on observation of surface water connections[ or] . . . testimony of discharges based on

observation of the flow of polluted water . . . . In either case, the agency must prove that the contaminant-laden waters ultimately reach covered waters." (*Rapanos, supra*, 547 U.S. at p. 745 [165 L.Ed.2d at pp. 181–182] (plur. opn.), citation omitted.)

The "solid ground" we spoke of earlier supporting the Board's alternative rationale for issuing the ACL order against Garland—i.e., the rationale of discharging pollutants, without a proper permit, into "[non]waters of the United States" that eventually connect with a traditional navigable water, sections 1311 and 1342—is based not only on the *Rapanos* opinion that reads the Act's jurisdiction in the narrowest way (the plurality opinion), but also on the following three observations.

■ First, the *Rapanos* plurality opinion's phrasing of "any pollutant *that naturally washes downstream*" does not foreclose the Act from applying to a downstream wash through manmade conveyances, given the language and examples the plurality itself sets forth in conjunction with this phrasing. (*Rapanos, supra*, 547 U.S. at p. 743 [165 L.Ed.2d at p. 180] (plur. opn.).)

Second, Garland makes no effort in his reply brief to respond to the Board's argument (in its respondent's brief) of this alternative rationale. In its respondent's brief, the Board argued that "regardless of whether the [ephemeral] drainages at issue in this case themselves constitute waters of the United States, Garland remains liable for discharging pollutants into waters of the United States under the alternative [rationale for the ACL order] that the discharge travelled through point sources to waters of the United States."

Third, and finally, Garland apparently made no effort to counter the Board's argument regarding the ACL order's alternative rationale, given Garland's following highlighted concession in characterizing the issue on appeal, at the outset of his opening brief: "At issue in this appeal is whether ephemeral drainage swales, ditches, and culverts can be found to be 'waters of the United States' governed by the federal Clean Water Act, based on nothing more than a finding that the *drainages eventually connect with a navigable waterway* during high rain[fall] events."[4] (Italics added.)

---

[4] At oral argument, counsel for Garland claimed that the Board's alternative rationale for issuing the ACL order neither constituted a Board finding nor was supported by sufficient evidence. Of course, as we just noted, Garland did not make these claims in his briefing, which was the proper venue for doing so. (See *People v. Thompson* (2010) 49 Cal.4th 79, 110, fn. 13 [109 Cal.Rptr.3d 549, 231 P.3d 289]; *In re J.G.* (2008) 159 Cal.App.4th 1056, 1068 [72 Cal.Rptr.3d 42].) In any event, the Board set forth its alternative rationale in its ACL order (finding No. 25A). As for sufficient evidence to support the alternative rationale, the *Rapanos* plurality opinion of Justice Scalia states that the proof of downstream flow of pollutants required under section 1342 can be satisfied by the presence of a hydrologic connection. (*Rapanos, supra*, 547 U.S. at p. 745 [165 L.Ed.2d at pp. 181–182]] (plur. opn.).) Substantial

██ We conclude the Board acted properly in issuing the ACL order against Garland.

## DISPOSITION

The judgment is affirmed. The Board is awarded its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

Raye, P. J., and Mauro, J., concurred.

---

evidence of such a connection is shown by the Board's March 2006 followup field study (showing the ephemeral drainages are tributary to the Feather River), by the ACL hearing testimony of the Board's assistant executive officer, and professional engineer, James Pedri (a substantial amount of construction site sediment would move downstream over time into the Feather River and the Thermalito Afterbay), and, of course, by Garland's conceding effectively that there is such a connection (see third observation above).