Filed 12/10/20

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MALAGA COUNTY WATER DISTRICT,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD,<br><br>    Defendant and Respondent. | F075851<br><br>(Super. Ct. No. MCV071279)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  James E. Oakley, Judge.

Costanzo & Associates and Neal E. Costanzo for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Michael P. Cayaban, Carol A. Squire and Kathryn M. Megli, Deputy Attorneys General, for Defendant and Respondent.

-ooOoo-

This is one of several current disputes between Malaga County Water District (Malaga) and the Central Valley Regional Water Quality Control Board (Water Quality Board).  In this instance, Malaga desired a wastewater discharge permit allowing it to discharge 0.85 million gallons per day (mgd) into certain disposal ponds.  The Water Quality Board says the permit issued to Malaga allowed just that.  And the trial court that

heard Malaga's petition for a writ of mandate agreed. Yet, in unusually aggressive and at times unnecessarily caustic language, Malaga argues the Water Quality Board is playing games, that its staff are deliberately providing false testimony, and that the permit issued actually limited Malaga to discharging 0.49 mgd. Malaga requests we set aside the trial court's decision that the permit allowed a discharge of 0.85 mgd.

We note at the outset that Malaga's aggressive approach seems misplaced in this instance. In our review of the record, we see nothing that meaningfully distinguishes the underlying issues in this case from the many administrative hearings and processes we regularly review. While certain cases could turn on such posturing, this is not one of them. Indeed, as the Water Quality Board points out, the position Malaga took could have resulted in terminating a permit that allowed it to operate and replacing it with one that Malaga admits is insufficient to continue its current operations. It is unclear to us why litigation of this type was necessary when alternative administrative procedures could have resolved this issue in a faster and more efficient manner.

The case is somewhat unique, though; both on the merits and in its procedural posture. The trial court resolved this case by interpreting the disputed permit as initially allowing the 0.85-mgd discharge, subject to verification of certain information by the Water Quality Board's executive officer. In doing so, it determined the verification process did not amount to a modification of the permit and thus did not constitute an improper delegation of authority from the Water Quality Board to its executive officer. Substantively, delegation issues are not frequently raised and thus there is little relevant case law to rely upon. Procedurally, as a result of its decision, the trial court determined all remaining issues need not be resolved and thus did not reach procedural and due process concerns surrounding the underlying permitting process raised by the parties. Despite this, both parties spend extended time arguing whether Malaga properly exhausted its administrative remedies such that it can argue its procedural issues at all, and whether any of those alleged procedural failures warrant vacating the permit.

2.

Further, in the time this case has been pending, Malaga's permit has expired and a new permit has issued, regulating Malaga's conduct going forward and allegedly cutting off any potential liability for past conduct. This has raised fresh arguments the case is moot.

In this opinion, we conclude that the primary issue raised in this case is sufficiently important to warrant the use of our discretion to hear issues that are technically moot. That issue is whether the verification process included in Malaga's permit constituted an improper delegation of authority from the Water Quality Board to its executive officer. Upon review, we conclude that it did. We do not, however, reach Malaga's or the Water Quality Board's remaining issues, because those issues were not part of the trial court's final judgment, were not resolved in the first instance by the trial court, and are thus insufficiently developed to determine whether they could either support the trial court's judgment or require vacating the entire permit issued. Accordingly, for the reasons set forth below, we reverse the trial court's judgment and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

The trial court's statement of decision contains a detailed summary of the facts leading to the main dispute it resolved. As none of those facts are meaningfully contested on appeal, we generally rely on them here, adding additional factual and procedural details relevant to our decision.

Malaga owns and operates a wastewater treatment facility in Fresno County, providing sewer service primarily to industrial and nondomestic users. As part of its operations, Malaga discharges certain types of treated wastewater into disposal ponds (in the case of undisinfected secondary treated wastewater), or in some instances, into a canal owned and operated by the Fresno Irrigation District (in the case of disinfected tertiary treated wastewater discharged when the canal contains irrigation water deliveries). The average flow of water treated by Malaga between 2010 and 2013 was 0.65 mgd.

3.

Malaga's discharge of treated wastewater is legally governed by both California and federal laws. The Water Quality Board is the entity tasked with permitting and regulating Malaga's activities under both legal frameworks. Between 2008 and 2013, Malaga's activities were regulated under order No. R5-2008-033, adopted by the Water Quality Board renewing Malaga's waste discharge requirements (the requirements imposed by California law) for its National Pollutant Discharge Elimination System (NPDES) permit No. CA0084239 (the permit required under federal law). The waste discharge requirements and permit were enforced, as is normally the case, with a separate cease and desist order (order No. R5-2008-0032). We refer to these documents as the 2008 permit for ease of reference.

Under the 2008 permit, Malaga could discharge 0.85 mgd of undisinfected secondary treated wastewater into the disposal ponds, which were identified as Discharge Point 002. This 0.85 mgd number is technically referred to as an effluent flow limitation. The canal was separately permitted and identified as Discharge Point 001. The relevant permits are required to be renewed every five years, with the renewal triggered by Malaga filing a report of waste discharge.

Malaga timely submitted its report of waste discharge in September 2012. In response, around August 2013, the Water Quality Board asked Malaga for additional information concerning the capacity of its disposal ponds to ensure compliance with certain terms of the 2008 permit. Malaga's response stated Malaga was "in the planning process to develop a schedule to isolate one or more of the ponds to confirm and monitor percolation capacity," although it also provided a chart showing some disposal capacities and percolation rates. Seemingly finding this response inadequate, staff working on the renewal permits apparently turned to information from 2008 suggesting the maximum capacity of the disposal ponds was 0.49 mgd.

In August 2014, the Water Quality Board sent Malaga drafts of a new waste discharge requirement, NPDES permit, and cease and desist order. These draft

4.

documents contained a proposed modification to the discharge limitation for the disposal ponds, stating that a maximum discharge of 0.49 mgd would be allowed. A second draft was circulated for public review on September 26, 2014, and a hearing on the matter was set in December 2014. At this point, a flurry of information was exchanged between Malaga and the Water Quality Board. Malaga submitted updated information supporting its request for a 0.85-mgd discharge limit on October 27, 2014, was told that information did not conform to Water Quality Board requirements, and then submitted conforming documents on November 3, 2014. On December 2, 2014, Malaga submitted additional information in the form of a disposal pond capacity matrix.

In written notes submitted prior to and in testimony at the December 2014 hearing, staff for the Water Quality Board stated they had not had enough time to review Malaga's submissions. The staff continued to recommend a 0.49-mgd limit but noted in their draft that "if review of the technical information provided supports a higher effluent flow limitation to the disposal ponds, this Order allows the Executive Officer to approve a higher effluent flow limitation." Counsel for Malaga appeared at the December 2014 hearing, where evidence was submitted by Water Quality Board staff and their counsel.[1]

Following the hearing, the Water Quality Board issued renewed waste discharge requirements (order No. R5-2014-0145), a new NPDES permit (permit No. CA0084239), and an updated cease and desist order (order No. R5-2014-0146), which we refer to as the 2014 permit. The 2014 permit set the permitted discharge rate into the disposal ponds at 0.49 mgd, effective February 1, 2015, but allowed an increase in the permitted discharge rate up to 0.85 mgd, subject to the approval of the Water Quality Board's executive

---

[1]     Malaga and the Water Quality Board raise several issues with the procedural aspects of this hearing. However, as we do not reach these issues, we recite relevant facts related to these procedural issues if the need arises and do not lay them out in detail.

officer and provided Malaga presented the Water Quality Board with specific data identified in the 2014 permit.**2**

Malaga contends it was later summoned to a meeting with the Water Quality Board's executive officer where it provided no new information, yet later received a letter from the executive officer increasing the permitted effluent flow to 0.85 mgd. The Water Quality Board contends Malaga submitted additional information on December 29, 2014, January 5, 2015, and January 12, 2015. The Water Quality Board agrees, however, that its executive officer then issued a letter that effectuated the 0.85-mgd effluent flow limitation. This letter issued on January 21, 2015.

Malaga filed a petition for review with the State Water Resources Control Board and, later, on December 31, 2014, filed the present writ of mandate action. The trial court provided its tentative ruling on the writ of mandate on December 16, 2016, and, after additional disputes between the parties, issued its statement of decision on April 17, 2017.

As noted above, the trial court concluded that this case turned exclusively on whether an effluent flow limitation of 0.85 mgd had been properly permitted by the Water Quality Board or whether that flow rate constituted an improper delegation of authority.**3** It summarized the four issues before it as follows:

"1.     Whether the Executive Officer's letter affected a change to the permit by increasing the flow rate to the disposal ponds.

_____

**2**     We recount the exact language of the permits as needed in our discussion of the merits.

**3**     In its statement of decision, the trial court wrote that a finding of improper delegation would entitle Malaga to a writ of mandate commanding the Water Quality Board to set aside the 2014 permit. Although we find an improper delegation in this case, we do not order the trial court to issue a writ of mandate. This is so because the trial court could potentially determine Malaga's claims are barred for other reasons or that only certain portions of the 2014 permit should be set aside. As the court found the delegation was valid, it did not reach any disputes regarding exhaustion, procedural fairness, or evidentiary support for the permit raised in this case. Nor has it had an opportunity to consider whether additional facts have mooted the case. We leave it to the trial court to resolve any such remaining disputes in the first instance.

"2.     Whether the [2014] permit is impermissibly premised solely on hearsay and whether the [Water Quality] Board disregarded unimpeached undisputed evidence presented.

"3.     The Order does not conform to *Topanga Ass*[*n.*] [*F*]*or a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 516–517.

"4.     [Water Quality] Board violated the Administrative Procedures [*sic*] Act, which requires reversal of their decisions."

In analyzing the first issue, the trial court determined a "fair argument could be made that the granting of exemptions by an executive officer is tantamount to delegating to the executive officer the power to modify or revoke the regional water quality control plan as to the entity to which such an exemption is granted." However, after reviewing two primary cases, *Hampson v. Superior Court* (1977) 67 Cal.App.3d 472, 483 (*Hampson*) and *Russian River Watershed Protection Committee v. Santa Rosa* (9th Cir. 1998) 142 F.3d 1136, 1143 (*Russian River*), and the language of the permit, the court concluded the 2014 permit did not improperly delegate authority to the executive officer. Rather, the court found the permit granted "an effluent discharge rate of 0.49 mgd at [D]ischarge [P]oint 002, but also permitted a discharge rate of up to 0.8[5] mgd, conditioned upon the approval of the Executive Officer" with "specific guidance to [Malaga] and to the Executive Officer as to that which would be required of [Malaga] to obtain such approval." Reviewing the subsequent history, the court then found that Malaga had, in fact, requested the higher effluent discharge rate and that "approval by the Executive Officer of the higher of the two effluent discharge rates provided in the 2014 [permit], as requested by [Malaga] and upon presentation by [Malaga] to the [Water Quality Board] of the specific data identified in the 2014 [permit], constitutes implementation by the Executive Officer of the 2014 [permit], and not the issuance, modification, or revocation of such orders."

7.

After reaching this conclusion, the trial court declared the action was moot. This was so, according to the court, because "the 0.49[-]mgd discharge rate was never in effect," and thus Malaga was "never at risk of violating the maximum flow rate by discharging effluent into the ponds in excess of the allowable maximum." The court found that as of the effective date of the 2014 permit, Malaga "has been authorized to discharge to the on-site disposal ponds at the rate of 0.85 mgd under the terms and conditions" of the 2014 permit. The court concluded that no relief could be afforded to Malaga, mooting its claims.

Finally, the court added a brief ruling on a pending motion to strike portions of the administrative record. There, the court stated it was "unable to identify any document which was submitted as part of the Administrative Record which should not properly be a part of the Administrative Record and which would have any effect on the ultimate determination by the Court to deny the Petition for Writ of Mandate on the grounds that the relief requested by [Malaga] is now moot." This appeal timely followed.

While this case was pending, on January 31, 2020, Malaga's 2014 permit expired.[4] On February 20, 2020, the Water Quality Board issued Malaga a new waste discharge requirement permit. The 2020 permit alleged Malaga no longer discharged wastewater into a specific canal, which eliminated the need for a federal NPDES permit, and thus purported to only comprise a state waste discharge requirement permit. The 2020 permit purported to permit a discharge to on-site disposal ponds that "shall not exceed a monthly average flow of 0.85 mgd."

---

[4]    On July 27, 2020, the Water Quality Board filed a motion to dismiss this appeal, arguing it was moot, and a related request for judicial notice of Malaga's 2020 waste discharge requirement permit. In its opposition to the motion to dismiss, Malaga stated it had no objection to this court taking judicial notice of the permit, although it argued hearsay facts within the document could not be accepted as true. Malaga further requested we take judicial notice of the record in case No. F078327, an appeal from sanctions allegedly imposed under the 2008 and 2014 permits. Upon review, we conclude it proper to take judicial notice of the 2020 permit and the record in case No. F078327.

8.

**DISCUSSION**

In this case, we are tasked with resolving two significant disputes. First, whether this case is moot, either on the grounds identified by the trial court or on the grounds raised in the Water Quality Board's motion to dismiss. Second, if the case is to proceed, whether the Water Quality Board improperly delegated its authority to its executive officer in this instance. On the first dispute, we decline to specifically resolve whether this case is moot. While the Water Quality Board is correct that Malaga no longer faces the prospect of a citizen suit for its past discharges in violation of the 0.49-mgd discharge limitation, issues exist regarding whether the overall relief sought by Malaga would affect the sanction proceedings on appeal in case No. F078327, such that a later finding that the permit was improper on any of the grounds not previously reached by the trial court below and thus must be vacated, would still afford Malaga relief in this action. We take no position on whether the case is, in fact, moot. Rather, assuming that to be the case, we exercise our discretion to resolve the dispute before us because it is one of broad public interest that is likely to recur. On the second dispute, we conclude that the delegation of authority to increase Malaga's permitted effluent flow discharge rate based on the submission of additional technical evidence is an improper delegation of authority. We thus reverse the trial court's judgment and remand this case so the court can determine whether any further proceedings are necessary given the potential mootness of the case.

*Mootness Arguments*

There are several mootness arguments raised in this case. The first arises because the trial court concluded this case was moot given the 2014 permit, in combination with the executive officer's letter, granted Malaga a 0.85-mgd effluent discharge limitation prior to the effective termination of its prior permit, leaving no relief available under the writ of mandate. We do not agree. " 'The pivotal question in determining if a case is moot is … whether the court can grant the plaintiff any effectual

9.

relief. [Citations.] If events have made such relief impracticable, the controversy has become "overripe" and is therefore moot.' [Citation.] By the same token, an appeal is moot if ' "the occurrence of events renders it impossible for the appellate court to grant appellant any effective relief." ' " (*Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 174–175.) As we have noted, according to our forthcoming analysis, the 2014 permit did not grant Malaga a 0.85-mgd effluent discharge limit because the authorization for that flow rate was improperly delegated to the executive officer. Accordingly, the trial court's judgment cannot be affirmed on this ground.

The briefing also contained a second mootness argument, where the Water Quality Board argued we should conclude this matter is moot on the premise that there is no case or controversy existing with respect to discharge into the disposal ponds. More specifically, in response to arguments made by Malaga, the Water Quality Board argued that disposal ponds are exempt from the Federal Water Pollution Control Act, as they are not waters of the United States, and thus there is no risk of citizen suits against Malaga under that law. The argument went on to contend that citizen suits are not permitted under California law, eliminating any potential harm to Malaga.

Even if this contention is correct, a question that turns on factual issues regarding the nature of the disposal ponds that was not resolved by the trial court, the Water Quality Board's mootness argument was unavailing at the time the case was filed. As discussed below, the 2014 permit contained an express right to discharge 0.49 mgd and an improperly delegated authority to increase that flow to 0.85 mgd. Malaga then conceded that it could not operate without violating the law under a 0.49-mgd limitation, writing "Malaga is not complying with the [0].49[-]mgd limitation, because it cannot." At a minimum then, the 2014 permit placed Malaga in a position where it could not legally continue to operate due to a permit that Malaga contends is the result of legally improper practices. Regardless of the possibility of a citizen suit, Malaga's suit could relieve Malaga of the claim it has been operating in violation of the law if Malaga's claims

10.

succeeded; particularly so if Malaga's claims ultimately resulted in vacating the permit. As the permit has now expired, however, it appears this argument has at least partially merged into the arguments made in the Water Quality Board's motion to dismiss.

In that motion, the Water Quality Board argues that the 2014 permit has now expired; legally precluding any federally authorized citizen suits arising from past conduct under the permit. (See *Gwaltney v. Chesapeake Bay Foundation, Inc.* (1987) 484 U.S. 49, 52 [federal suits alleging wholly past violations precluded].) Malaga responds by arguing that its claims are not meant merely to protect against federal citizen suits, but to prevent state enforcement actions under the 2014 permit, claiming case No. F078327, also pending in this court, demonstrates the need for such action. The Water Quality Board replies that this contention is wholly new and unbriefed, and thus improper at this stage. It further contends that, factually, Malaga's claim is incorrect because case No. F078327 relates to a prior 2008 permit and not to the 2014 permit.

We decline to resolve these disputes. " 'Ordinarily, … when a case becomes moot pending an appellate decision "the court will not proceed to a formal judgment, but will dismiss the appeal." ' " (*County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1005.) "There are, however, times when the appellate court may wish to examine the issues on appeal despite the occurrence of events which render the appeal moot." (*Id*. at p. 1006.) Thus, several exceptions to the general rule of dismissal exist, one of which "grants the appellate court the discretion to decide a case which, although technically moot, poses an issue of broad public interest that is likely to recur." (*Ibid*.) We conclude this exception is appropriate to utilize in this case.

In this case, Malaga contests the Water Quality Board's actions in modifying requirements for the permits issued under both federal and state water laws. Whether the Water Quality Board may, in fact, leave such decisions to its executive officer is a matter of broad public interest involving the operation of governmental agencies and potential impacts on the environment and public wastewater treatment plants. Further, the limited

11.

five-year timeframe of the permits at issue (see Wat. Code,[5] § 13378), coupled with the inherent delays in complex litigation such as this which typically arises after administrative proceedings, means that similar delegations of authority may evade review if mootness is strictly enforced. Accordingly, here we exercise our discretion to hear the matter even if moot. We expressly leave open any factual disputes regarding mootness, leaving those to the trial court upon remand given that our resolution means the court will also be faced with additional claims previously raised by Malaga that it chose not to reach upon concluding the 2014 permit did not include an improper delegation of authority. The trial court will be in the best position to resolve any mootness arguments at that time.

## ***Delegation of Authority***

Having exercised our discretion to hear this case, we next turn to whether the Water Quality Board improperly delegated its authority to its executive officer in this case. As we have previously noted, we conclude it did.

### *Standard of Review*

Decisions made by the Water Quality Board or the State Water Resources Control Board may be reviewed by way of a writ of mandate. (§ 13330, subds. (a), (b).) These writ proceedings are governed by Code of Civil Procedure section 1094.5. (§ 13330, subd. (e).) In such proceedings, the trial court's review "shall extend to the questions of whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) An abuse of discretion can occur three different ways: (1) "the respondent has not proceeded in the manner required by law"; (2) the "decision is not supported by the findings"; or (3) "the findings are not supported by the evidence." (*Ibid.*)

---

**5** All further statutory references are to the Water Code unless otherwise indicated.

12.

With regard to the relevant issues on appeal, Malaga's primary contention is that the Water Quality Board acted in excess of its jurisdiction by delegating its authority to modify a permit to its executive officer in violation of section 13223. As the Water Quality Board's authority to act turns on the interpretation and application of this statute to the permit issued, we undertake a de novo review of its action. (See *Hoag Memorial Hospital Presbyterian v. Kent* (2019) 36 Cal.App.5th 413, 421 [" 'If a question of law is presented, we undertake a de novo review of the [Department's] ruling' "]; *Hoitt v. Department of Rehabilitation* (2012) 207 Cal.App.4th 513, 522 ["Issues of law raised in a petition for a writ of administrative mandate, including the interpretation of applicable statutes or regulations, are for the courts to resolve de novo"].)

*Overview of Relevant Laws*

The laws relevant to this appeal are part of a "complicated web of federal and state laws and regulations concerning water pollution" that have been discussed in many cases. (*City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1380.)

At the federal level, Malaga's water discharges can be regulated by the Federal Water Pollution Control Act (Clean Water Act; 33 U.S.C. § 1251 et seq.). "Part of the federal Clean Water Act is the National Pollutant Discharge Elimination System (NPDES), '[t]he primary means' for enforcing effluent limitations and standards under the Clean Water Act. [Citation.] The NPDES sets out the conditions under which the federal [Environmental Protection Agency] or a state with an approved water quality control program can issue permits for the discharge of pollutants in wastewater. [Citations.] In California, wastewater discharge requirements established by the regional boards are the equivalent of the NPDES permits required by federal law." (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 621.)

The Clean Water Act covers discharges into waters of the United States, a broad but not unlimited category of navigable and closely related bodies of water. (See

*Garland v*. *Central Valley Regional Water Quality Control Bd.* (2012) 210 Cal.App.4th 557, 561–563 [providing overview of federal dispute regarding the meaning of waters of the United States].)  It makes such discharges illegal without a proper NPDES permit. (*Id.* at p. 561.)

California adopted the Porter-Cologne Water Quality Control Act (§ 13000 et seq.) to ensure that its state-level water laws were adequate to meet "the necessary federal requirements to ensure [California] would obtain [United States Environmental Protection Agency] approval to issue NPDES permits."  (*Building Industry Assn. of San Diego County v*. *State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 875.) In doing so, it statutorily defined the term " 'waste discharge requirements' " to be the equivalent of the term " 'permits' " as used in the relevant federal law.  (§ 13374.)

California's state-level water laws regulate persons "discharging waste, or proposing to discharge waste, within any region that could affect the quality of the waters of the state" by requiring them to file a report of the discharge with the appropriate regional board.  (§ 13260, subd. (a).)  Upon receipt of this filing, the regional board "after any necessary hearing, shall prescribe requirements as to the nature of any proposed discharge, existing discharge, or material change in an existing discharge … with relation to the conditions existing in the disposal area or receiving waters upon, or into which, the discharge is made or proposed.  The requirements shall implement any relevant water quality control plans that have been adopted, and shall take into consideration the beneficial uses to be protected, the water quality objectives reasonably required for that purpose, other waste discharges, the need to prevent nuisance .…"  (§ 13263, subd. (a).) This action creates the waste discharge requirements that may also constitute an NPDES permit.  Parallel state law provisions require reporting discharges or proposed discharges into the navigable waters of the United States and, with slight variations, subjects those reports to the same proceedings as discharges that could affect the quality of the waters of the state.  (See §§ 13376–13378.)

14.

Persons affected by the waste discharge requirements issued by the regional board may petition for review or revision of those requirements, although the regional board must review them periodically regardless. (§ 13263, subd. (e).) Notably, "[n]o discharge of waste into the waters of the state, whether or not the discharge is made pursuant to waste discharge requirements, shall create a vested right to continue the discharge. All discharges of waste into waters of the state are privileges, not rights." (§ 13263, subd. (g).)

Relevant to this case and the process by which waste discharge requirements are issued or modified, under section 13223, subdivision (a): "Each regional board may delegate any of its powers and duties vested in it by this division to its executive officer excepting only the following: (1) the promulgation of any regulation; (2) the issuance, modification, or revocation of any water quality control plan, water quality objectives, or waste discharge requirement; (3) the issuance, modification, or revocation of any cease and desist order; (4) the holding of any hearing on water quality control plans; and (5) the application to the Attorney General for judicial enforcement but excluding cases of specific delegation in a cease and desist order and excluding the cases described in subdivision (c) of Section 13002 and Sections 13304 and 13340."

*The Authority Granted the Executive Officer Was Improperly Delegated*

The trial court's ruling in this case turned on whether the 2014 permit improperly delegated authority to the executive officer to modify the terms of the waste discharge requirement's effluent discharge limitation. We thus start with the permit's language.

The 2014 permit states: "The average monthly discharge flow shall not exceed the following: [¶] … [¶] b. 0.49 mgd at Discharge Point 002, unless the Executive Officer approves a higher flow, up to 0.85 mgd, as allowed by Provision VI.C.2.b." Provision VI.C.2.b. provides: "As described in Attachment F - Fact Sheet, Section II.B.3, the estimated disposal capacity of the ponds (Discharge Point 002) is approximately 0.49 mgd. This Order restricts the flow to Discharge Point 002 to 0.49 mgd as an average

15.

monthly.  Order R5-2008-0033 included an effluent flow limitation to Discharge Point 002 of 0.85 mgd, as an average monthly.  The Discharger may request an increase in flow at Discharge Point 002, up to 0.85 mgd.  The request for the increase in flow must include supporting calculations and documentation showing the ponds have enough capacity for reliably disposing of the requested average monthly flow.  At minimum, the request must address the percolation rate and how the rate was determined.  The request must also include a proposed maintenance program for the disposal ponds, which shall include an ongoing schedule for performing maintenance work to maintain adequate disposal capacity.  The increased flow will be subject to Executive Officer approval, and the Discharger may not discharge at the higher flow rate until any and all proposed maintenance work has been completed and the request for an increase in flow has been approved by the [Water Quality Board's] Executive Officer."

Reviewing this language, the trial court concluded no improper delegation of authority occurred because under *Hampson* and *Russian River*, the permit had properly drawn the line between delegating the power to issue, modify, or revoke a permit and delegating the power to grant exemptions provided certain conditions were met.  We do not agree with this parsing of the case law.

In *Hampson*, the court was considering a writ of prohibition filed by the California Regional Water Quality Control Board, Lahontan Region (Lahontan Board) and its executive officer, Hampson, seeking to enjoin the superior court from proceeding on a writ of mandate filed by the real party in interest, Walker.  (*Hampson*, *supra*, 67 Cal.App.3d at p. 475.)  In analyzing this issue, the court was faced with a difficult procedural question concerning whether Walker had properly exhausted his administrative remedies before seeking the writ of mandate.  (*Id*. at p. 480.)

The underlying merits of the case involved a claim by Walker that the Lahontan Board had improperly denied Walker's request for an exemption to a water control plan that prohibited the construction of individual septic tanks and leach fields in certain areas.

16.

(*Hampson*, *supra*, 67 Cal.App.3d at pp. 475, 478.) The plan, as adopted, authorized "the executive officer to grant exemptions from the prohibition upon proof by the dischargee that the proposed design will not result in pollution or nuisance." (*Id*. at p. 478.) Walker had requested an exemption from Hampson who, instead of granting or denying it, took the issue to the Lahontan Board for a vote. (*Id*. at p. 479). That vote denied the exemption request. (*Ibid*.)

Walker did not seek administrative review of the vote denying his exemption request, which led to a claim by the Lahontan Board and Hampson that Walker had failed to exhaust his administrative remedies. (*Hampson*, *supra*, 67 Cal.App.3d at p. 475.) In response, Walker argued that the Lahontan Board and Hampson were estopped from arguing the exhaustion issue. Walker claimed he had previously come to some form of an agreement, not fully described in the case, with Hampson that worked as a final administrative decision on the exemption request. Walker argued Hampson's later decision to bring the request to the Lahontan Board for a vote was taken in bad faith and that the Lahontan Board was bound by the prior agreement and thus estopped from arguing failure to exhaust administrative remedies. (*Id*. at pp. 479–480.)

Although the court was clear that it was not reaching the merits of the underlying dispute, it was required to discuss the authority of the board to delegate exemption authority to Hampson in order to resolve the procedural issues before it. (*Hampson*, *supra*, 67 Cal.App.3d at pp. 476, 483.) On this issue, it wrote: "Although resolution 75-5 which was adopted as an addendum to the regional water quality control plan authorized the executive officer to grant exemptions provided certain conditions were met, it did not, and could not, delegate its power and duty to issue, modify, or revoke any water control plan, water quality objection or waste discharge requirement. ([]§ 13223.)" (*Id*. at p. 483.) The court further wrote: "Consequently, even though the resolution authorized the executive officer to make the initial determination as to whether the landowner had met the prerequisites for an exemption, the regional board could not

17.

relinquish its right and duty to overrule such preliminary determination if it determined that to grant an exemption would constitute a modification of the water control plan or the waste discharge requirement included in that plan." (*Id*. at p. 484.) Utilizing this view, the court determined no estoppel could occur because Walker could not properly rely on an agreement with the executive officer that exceeded that officer's legally authorized powers. In other words, the court held that an exemption granted by the executive officer would violate section 13223 as an improper delegation, that Walker was chargeable with the knowledge of such a fact, and thus that Walker could not rely on any alleged agreement with Hampson. (*Hampson*, at pp. 483–484.)

It is in analyzing this case that the trial court's reasoning went astray. While the trial court concluded *Hampson* "drew the distinction between delegating to the executive officer the power to issue, modify, or revoke, on the one hand, and delegating to the executive officer the power 'to grant exemptions provided certain conditions were met,' on the other," the case did not actually go so far. Rather, *Hampson* follows the direct premise set out in section 13223, that under no circumstances may the relevant water board delegate authority that would result in issuing, modifying, or revoking a waste discharge requirement. The *Hampson* court's analysis implies that where such a delegation is made, the most that delegation can create is an opportunity for the executive officer to review the materials submitted and recommend to the board that those materials either meet or fail to satisfy the requirements for issuing, modifying, or revoking a waste discharge requirement. The final legal authority rests in the board itself, and the law is clear enough on this point that persons dealing with the board are presumed to know this fact.

With this in mind, cases like *California Assn. of Sanitation Agencies v. State Water Resources Control Bd.* (2012) 208 Cal.App.4th 1438 (*Sanitation Agencies*) and *Russian River* are readily understood as defining one of the boundary lines for determining whether an improper delegation of power has occurred—whether the

decision modifies the terms of the permitted action or merely serves to determine how to enforce those terms. In *Russian River*, the underlying NPDES permit contained a discharge limit of one percent of the flow of the Russian River after it initially reaches a flow of 1,000 cubic feet per second, a location at which to measure this flow, and an identification of specific limitations on the discharge of effluents. (*Russian River*, *supra*, 142 F.3d at p. 1139.) It did not, however, identify a method for measuring either of these limits. (*Ibid*.) In *Sanitation Agencies*, a disputed water plan contained a provision stating that " '[t]otal identifiable persistent chlorinated hydrocarbon pesticides shall not be present in the water column at concentrations detectable within the accuracy of analytical methods approved by the [EPA] or the Executive Officer [of the Regional Board].' " (*Sanitation Agencies*, at p. 1464.) Both cases involved challenges to the delegation of authority to the executive officer to determine how to measure or otherwise monitor these requirements. And both cases upheld the delegations on the ground that establishing a method of compliance with a preset requirement does not constitute modification of that requirement. (*Sanitation Agencies*, at p. 1468; *Russian River*, at p. 1143.)

Turning back to the specific language of the 2014 permit, we read the plain language of the disputed provisions to provide a specific authorization to discharge 0.49 mgd with authority to increase that discharge to 0.85 mgd placed in the executive officer. We further conclude the ability to increase the discharge limit constitutes a delegation of the authority to modify the permit.

The parties have identified no case law specifically on point with respect to determining whether the increase in effluent discharge authorized by the executive officer constitutes a modification of the waste discharge requirement, and we have identified none in our own research. However, both sides note that the relevant provisions of California's laws are meant to implement and mirror the requirements of the Clean Water Act and its NPDES permit process. In several cases under that federal scheme, changes to effluent discharge limitations, or other changes to discharge requirements in NPDES

permits, have been rejected as improper modifications of the permit if the formal modification procedures of the statutory scheme have not been met. (See *Proffitt v. Rohm & Haas* (3d Cir. 1988) 850 F.2d 1007, 1012–1013 [relaxing of cadmium, biochemical oxygen demand, and chemical oxygen demand discharge limitations improper modification when amendments were not subject to public notice or hearings]; *Citizens For A Better Environment v. Union Oil Co.* (9th Cir. 1996) 83 F.3d 1111, 1119–1120 [provisions in cease and desist order allowing time to comply with permitted requirements could not override permit's specific mandates]; *Ohio Valley Envtl. Coalition, Inc. v. Apogee Coal Co.*, LLC (S.D.W.Va. 2008) 555 F.Supp.2d 640, 645–646 [compliance order removing effluent limitations to comply with longstanding agency practice insufficient to modify permit where formal modification requirements not met].) Although none of these cases expressly hold that a change to previously set discharge numbers constitute a modification to an NPDES permit, each implicitly rests on that conclusion.

Concluding that increasing the effluent discharge limitation in this case constitutes a modification is also appropriate when viewing the purpose of formal hearings for permit modifications in the NPDES. In each of the three federal cases noted above, holding formal public hearings before changing the previously set discharge limitations, or otherwise modifying the specific terms of the permit, was deemed necessary as part of a broader public function of the permitting process.

"Public notice is not merely a formality; it ensures that the public has a meaningful opportunity to participate in the issuance of a permit." (*Ohio Valley Environmental Coalition, Inc. v. Apogee Coal Co.*, LLC, *supra*, 555 F.Supp.2d at p. 646.) Such public proceedings "ensure that the standards embodied in an NPDES permit cannot be evaded with the cooperation of compliant state regulatory authorities." (*Citizens For A Better Environment v. Union Oil Co.*, *supra*, 83 F.3d at p. 1120.) In the present case, a public hearing was held where evidence was discussed supporting and opposing the proposed

0.49-mgd limit.  Although the propriety of that figure was heavily disputed, the public was presented with an opportunity to review the appropriateness of that figure.

In contrast, prior to the purported amendment to 0.85 mgd, only the executive officer was required to see the documents submitted supporting that level of discharge. There was no effective way for the public to review and test the percolation rate calculations, the maintenance schedule, or any of the other requirements the Water Quality Board considered essential to increasing the permitted flow.  The public was not informed whether or not the documents properly showed a 0.85-mgd discharge was viable and thus could not ensure that proper permitting requirements were not being evaded through the cooperation of a compliant regulatory officer.

We conclude that a determination increasing the permissible water flow of a waste discharge plan constitutes a modification under section 13223.  This conclusion is consistent with the notion in *Hampson* that granting an exemption to a water control plan or the waste discharge requirements therein would constitute a modification of that plan. Unlike *Russian River* and *Sanitation Agencies*, granting an increase in water discharge amounts is not equivalent to adopting a method of compliance with a predetermined permissible discharge.  Such a change is much more closely aligned with the types of changes found to require formal modification procedures in the federal cases discussed above.  Thus, at best, the language of the waste discharge requirements could only grant the executive officer the ability to review the increase request and provide a modification recommendation to the Water Quality Board.  The trial court's conclusion to the contrary was incorrect.

### *We Do Not Reach the Remaining Disputes*

The parties raise several additional claims in this appeal.  Malaga argues that even if the 2014 permit did authorize a 0.85-mgd discharge, it would not matter as the permit is a nullity due to several procedural flaws and alleged violations of the Administrative Procedure Act (Gov. Code, § 11400 et seq.).  The Water Quality Board responds with

21.

allegations Malaga failed to exhaust its administrative remedies regarding virtually every issue raised and maintains there were no procedural violations. The trial court based its judgment upon a determination that the matter was moot because the 2014 permit granted Malaga a 0.85-mgd discharge at all relevant times. Because of this determination, the trial court did not specifically consider or rule upon any assertions regarding the exhaustion of administrative remedies, procedural or Administrative Procedure Act violations, or other related issues.

On appeal, we review the judgment of the underlying court. In this instance, that judgment is the 2014 permit grants a 0.85-mgd discharge and this grant renders the action moot. The remaining issues raised by the parties do not relate to this judgment, but only arise should it be set aside and the case not be deemed moot. Accordingly, we exercise our discretion not to reach these issues. We remand this matter to the trial court to first consider whether the expiration of the 2014 permit renders this case moot and, if not, to resolve any remaining disputes in the first instance.

## DISPOSITION

The Water Quality Board's motion to dismiss is denied.

The Water Quality Board's request for judicial notice is granted.

The judgment is reversed, and the matter remanded for further proceedings consistent with this opinion.

Malaga is entitled to its costs on appeal.

HILL, P.J.

WE CONCUR:


LEVY, J.


DETJEN, J.

22.